IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs February 2, 2021

IN RE MALACHI M.

Appeal from the Juvenile Court for Roane County
No. 2020-JC-12          Terry Stevens, Judge
_____

No. E2020-01114-COA-R3-PT
_____

In this termination of parental rights case, the child was placed in the custody of the Tennessee Department of Children's Services ("DCS") because the child's parents were incarcerated. The mother's parental rights were later terminated based upon the trial court's finding of clear and convincing evidence regarding two statutory grounds: (1) abandonment by an incarcerated parent and (2) failure to manifest an ability and willingness to assume legal and physical custody of or financial responsibility for the child. The trial court further determined by clear and convincing evidence that termination of the mother's parental rights was in the child's best interest. The mother timely appealed. Discerning no reversible error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court
Affirmed; Case Remanded**

THOMAS R. FRIERSON, II, J., delivered the opinion of the court, in which W. NEAL MCBRAYER and KENNY W. ARMSTRONG, JJ., joined.

Allison M. Rehn, Harriman, Tennessee, for the appellant, Casey M.

Herbert H. Slatery, III, Attorney General and Reporter, and Jordan K. Crews, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

**OPINION**

I. Factual and Procedural Background

On January 23, 2020, DCS filed a petition in the Roane County Juvenile Court ("trial court"), seeking to terminate the parental rights of Casey M. ("Mother") and Derek

C. ("Father")[1] to their minor child, Malachi M. ("the Child"), who was three years of age at the time of the petition's filing. In its petition, DCS alleged that the Child had been adjudicated dependent and neglected in early 2019 following entry of a protective custody order on December 17, 2018. According to DCS, the Child had been in foster care since that time.

DCS alleged that two statutory grounds supported termination of Mother's parental rights: (1) abandonment by an incarcerated parent and (2) failure to manifest an ability and willingness to assume legal and physical custody of or financial responsibility for the Child. DCS averred that Mother had been incarcerated for all or part of the four months preceding the petition's filing and that Mother had engaged in conduct exhibiting wanton disregard for the Child's welfare prior to her incarceration by violating the terms of her community release, abusing illegal substances, and engaging in other criminal behavior. In addition, DCS alleged that Mother had failed to manifest a willingness and ability to assume legal and physical custody of or financial responsibility for the Child because the Child had been in foster care for thirteen months and because Mother remained unable to care for the Child. DCS also alleged that termination of Mother's parental rights was in the Child's best interest.

On March 23, 2020, the trial court entered an order appointing counsel for Mother due to her indigent status. The trial court subsequently ordered that Mother would be transported from prison for the termination hearing.

The trial court conducted a bench trial regarding termination of Mother's parental rights on July 2, 2020. Witnesses included Brandi Lawson, a DCS employee; Cara C., the Child's foster mother ("Foster Mother"); and Father. Although Mother was present with her counsel, she chose not to testify.

Determining that clear and convincing evidence supported the statutory grounds of (1) abandonment by an incarcerated parent and (2) failure to manifest an ability and willingness to assume legal and physical custody of or financial responsibility for the Child, the trial court entered a final order terminating Mother's parental rights on July 29, 2020. The court further determined that clear and convincing evidence supported the conclusion that termination of Mother's parental rights was in the Child's best interest. Mother timely appealed.

---

[1] Father is not participating in this appeal; therefore, we will confine our analysis solely to allegations concerning Mother.

## II. Issues Presented

Mother presents the following issues for this Court's review, which we have restated slightly:

1.  Whether the trial court erred in determining by clear and convincing evidence that DCS had proven the statutory ground of failure to manifest an ability and willingness to assume legal and physical custody of or financial responsibility for the Child.

2.  Whether the trial court erred in determining by clear and convincing evidence that termination of Mother's parental rights was in the best interest of the Child.

On appeal, Mother has not challenged the trial court's determination that clear and convincing evidence supported the statutory ground for termination of parental rights through abandonment by an incarcerated parent. However, correctly noting that this Court must "review thoroughly the trial court's findings as to each ground for [parental rights] termination and as to whether termination is in the child's best interests," *see In re Carrington H.*, 483 S.W.3d 507, 525 (Tenn. 2016), DCS has presented briefing and argument concerning that ground.

## III. Standard of Review

In a termination of parental rights case, this Court has a duty to determine "whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence." *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006). The trial court's findings of fact are reviewed *de novo* upon the record, accompanied by a presumption of correctness unless the evidence preponderates against those findings. *See* Tenn. R. App. P. 13(d); *see also In re Carrington H.*, 483 S.W.3d at 523-24; *In re F.R.R., III*, 193 S.W.3d at 530. Questions of law, however, are reviewed *de novo* with no presumption of correctness. *See In re Carrington H.*, 483 S.W.3d at 524 (citing *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009)). The trial court's determinations regarding witness credibility are entitled to great weight on appeal and shall not be disturbed absent clear and convincing evidence to the contrary. *See Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002).

"Parents have a fundamental constitutional interest in the care and custody of their children under both the United States and Tennessee constitutions." *Keisling v. Keisling*, 92 S.W.3d 374, 378 (Tenn. 2002). It is well established, however, that "this right is not absolute and parental rights may be terminated if there is clear and convincing evidence justifying such termination under the applicable statute." *In re Drinnon*, 776 S.W.2d 96,

97 (Tenn. Ct. App. 1988) (citing *Santosky v. Kramer*, 455 U.S. 745 (1982)).  As our Supreme Court has explained:

> The parental rights at stake are "far more precious than any property right." *Santosky* [*v. Kramer*], 455 U.S. [745,] 758-59 [(1982)].  Termination of parental rights has the legal effect of reducing the parent to the role of a complete stranger and of ["]severing forever all legal rights and obligations of the parent or guardian of the child."  Tenn. Code Ann. § 36-1-113(l)(1); *see also Santosky*, 455 U.S. at 759 (recognizing that a decision terminating parental rights is "*final* and irrevocable").  In light of the interests and consequences at stake, parents are constitutionally entitled to "fundamentally fair procedures" in termination proceedings.  *Santosky*, 455 U.S. at 754; *see also Lassiter v. Dep't of Soc. Servs. of Durham Cnty, N.C.*, 452 U.S. 18, 27 (1981) (discussing the due process right of parents to fundamentally fair procedures).
>
> Among the constitutionally mandated "fundamentally fair procedures" is a heightened standard of proof—clear and convincing evidence.  *Santosky*, 455 U.S. at 769.  This standard minimizes the risk of unnecessary or erroneous governmental interference with fundamental parental rights.  *Id.*; *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010).  "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings."  *In re Bernard T.* 319 S.W.3d at 596 (citations omitted).  The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not.  *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005).
>
> * * *
>
> In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights.  *In re Bernard T.*, 319 S.W.3d at 596-97.

*In re Carrington H.*, 483 S.W.3d at 522-24.  "[P]ersons seeking to terminate [parental] rights must prove all the elements of their case by clear and convincing evidence," including statutory grounds and the best interest of the child.  *See In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010).

- 4 -

IV. Grounds for Termination of Mother's Parental Rights

Tennessee Code Annotated § 36-1-113 (Supp. 2020) lists the statutory requirements for termination of parental rights, providing in relevant part:

(a)     The chancery and circuit courts shall have concurrent jurisdiction with the juvenile court to terminate parental or guardianship rights to a child in a separate proceeding, or as a part of the adoption proceeding by utilizing any grounds for termination of parental or guardianship rights permitted in this part or in title 37, chapter 1, part 1 and title 37, chapter 2, part 4.

* * *

(c)     Termination of parental or guardianship rights must be based upon:

    (1)     A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and

    (2)     That termination of the parent's or guardian's rights is in the best interests of the child.

The trial court determined that the evidence clearly and convincingly supported a finding of two statutory grounds to terminate Mother's parental rights: (1) abandonment by an incarcerated parent and (2) failure to manifest an ability and willingness to assume legal and physical custody of or financial responsibility for the Child. We will address each statutory ground in turn.

A. Abandonment by Incarcerated Parent

Tennessee Code Annotated § 36-1-113(g)(1) provides in relevant part:

(g)     Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and non-exclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:

    (1)     Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred; . . . .

The version of Tennessee Code Annotated § 36-1-102(1)(A)(iv) (Supp. 2019)[2] in effect at the time of the termination petition's filing defined abandonment, in pertinent part, as follows:

> (iv)    A parent or guardian is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child, or the parent or guardian has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action or proceeding, and either has failed to visit or has failed to support or has failed to make reasonable payments toward the support of the child for four (4) consecutive months immediately preceding such parent's or guardian's incarceration, or the parent or guardian has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child.

With regard to this statutory ground, the trial court found in pertinent part:

> [T]he Court finds that there is clear and convincing evidence that [Mother and Father] have abandoned this child due to their incarceration and prior to their most recent periods of incarceration, [Mother and Father] have engaged in conduct that exhibits a wanton disregard for the welfare of the child.

Ultimately a petition to terminate the parental rights of [Mother and

---

[2] Tennessee Code Annotated § 36-1-102(1)(A)(iv) (Supp. 2020) has since been amended and now provides in pertinent part:

> (iv)    A parent or guardian is incarcerated at the time of the filing of a proceeding, pleading, petition, or amended petition to terminate the parental rights of the parent or guardian of the child who is the subject of the petition for termination of parental rights or adoption, or a parent or guardian has been incarcerated during all or part of the four (4) consecutive months immediately preceding the filing of the action and has:
>
> > (a)    Failed to visit, has failed to support, or has failed to make reasonable payments toward the support of the child for four (4) consecutive months immediately preceding the parent's or guardian's incarceration;
> >
> > (b)    Failed to visit, has failed to support, or has failed to make reasonable payments toward the support of the child during an aggregation of the first one hundred twenty (120) days of non-incarceration immediately preceding the filing of the action; or
> >
> > (c)    Has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child[.]

Father] was filed on January 23, 2020. In the four months prior to the filing of the petition to terminate her parental rights, [Mother] was incarcerated at the Tennessee Prison for Women. The Court received copies of [Mother's] criminal convictions. [Mother] was convicted on April 26, 2016, of Introduction of Contraband into a Penal Institution, a C felony; [Mother] was sentenced to a four-year prison sentence to be served on the community corrections program; [the Child] was born one week later. [Mother] violated her community corrections program and was sentenced to serve her prison sentence with the Tennessee Department of Corrections on June 29, 2018. Prior to that time, [Mother] was actively engaged in drug use and criminal activity rendering her chronically unavailable to provide appropriate care and supervision for this child. [Mother's] drug use and criminal activity while on release on the community corrections program led to her eventual violation and commitment to the Tennessee Department of Corrections. At that time, [the Child] was placed in the custody of a third party prior to his bench order into foster care.

Upon review, we agree with the trial court that clear and convincing evidence existed to support this statutory ground for termination.

Ms. Lawson, who was the foster care manager for the Child, testified that the Child was brought into DCS custody in December 2018 because he was living with a third party while both parents were incarcerated. The third party reported that she had been taking care of the Child since January 2018 but could no longer do so because of health concerns. Ms. Lawson explained that Mother had been incarcerated during the entire period the Child had been in DCS custody. Ms. Lawson testified that Mother was scheduled for a parole hearing on July 21, 2020.

Trial exhibits demonstrate that Mother was convicted in 2016 of "Introduction of Controlled Substance in Penal Institution," a Class C felony, and that Mother was sentenced to four years in prison. According to Ms. Lawson's testimony and the trial exhibits, Mother was given the opportunity to be released on probation. Mother violated the terms of her probation by abusing drugs, however, and was reincarcerated in 2018, where she remained at the time of trial. At the time Mother was reincarcerated, the Child had been residing with a third party for several months, apparently due to Mother's unlawful drug use and inability to care for the Child. Ms. Lawson further stated that if Mother were not released on parole in July 2020, Mother's remaining sentence would extend approximately eighteen additional months.

Based on the foregoing proof, we conclude that clear and convincing evidence existed to support the termination of Mother's parental rights based on the ground of abandonment by an incarcerated parent. The evidence was undisputed that Mother was incarcerated at the time of the termination petition's filing and had been incarcerated

during all of the four months immediately preceding the termination petition's filing. In addition, we conclude, as did the trial court, that Mother engaged in conduct prior to her incarceration that exhibited wanton disregard for the welfare of the Child.

As this Court has previously explained: "We have repeatedly held that probation violations, repeated incarceration, criminal behavior, substance abuse, and the failure to provide adequate support or supervision for a child can, alone or in combination, constitute conduct that exhibits a wanton disregard for the welfare of a child." *In re Audrey S.*, 182 S.W.3d 838, 867-68 (Tenn. Ct. App. 2005). In the case at bar, Mother was convicted of introducing controlled substances into a penal institution when she was pregnant with the Child.[3] Mother was afforded the opportunity to be released on parole, but she violated that parole by engaging in substance abuse in 2018 and was reincarcerated as a result. Moreover, these events in 2018 occurred during a time when the Child was residing with a third party but before the Child was placed into DCS custody. We conclude that Mother's repeated criminal behavior resulting in incarceration and her failure to take care of the Child even when she was on parole demonstrate her wanton disregard for the Child's welfare. As such, clear and convincing evidence existed to support the termination of Mother's parental rights based on the ground of abandonment by an incarcerated parent.

### B. Failure to Manifest an Ability and Willingness to Assume Legal or Physical Custody of or Financial Responsibility for the Child

The trial court also found clear and convincing evidence to support termination of Mother's parental rights pursuant to Tennessee Code Annotated § 36-1-113(g)(14) (Supp. 2020), which provides:

> A parent or guardian has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[.]

Our Supreme Court has recently elucidated the following with regard to this ground for termination of parental rights:

> Two prongs must be proven by clear and convincing evidence to terminate parental rights under this statute: (1) the parent or legal guardian failed to manifest an ability and willingness to personally assume legal and physical

---

[3] We note that a parent's conduct prior to the child's birth can constitute wanton disregard for the child's welfare so long as that parent was aware of the child's existence *in utero*. *See In re Kyle F.*, No. E2017-01821-COA-R3-PT, 2018 WL 1953210, at *4 (Tenn. Ct. App. Apr. 25, 2018).

custody or financial responsibility of the child; and (2) placing the child in the parent's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child.

*In re Neveah M.*, 614 S.W.3d 659, 674 (Tenn. 2020).

As to the first prong, our Supreme Court has held:

[S]ection 36-1-113(g)(14) places a conjunctive obligation on a parent or guardian to manifest both an ability and willingness to personally assume legal and physical custody or financial responsibility for the child. If a person seeking to terminate parental rights proves by clear and convincing proof that a parent or guardian has failed to manifest either ability or willingness, then the first prong of the statute is satisfied.

*Id.* at 677 (citing *In re Amynn K.*, No. E2017-01866-COA-R3-PT, 2018 WL 3058280, at *13 (Tenn. Ct. App. June 20, 2018)). Concerning the "substantial harm" requirement of the second prong, this Court has observed:

The courts have not undertaken to define the circumstances that pose a risk of substantial harm to a child. These circumstances are not amenable to precise definition because of the variability of human conduct. However, the use of the modifier "substantial" indicates two things. First, it connotes a real hazard or danger that is not minor, trivial, or insignificant. Second, it indicates that the harm must be more than a theoretical possibility. While the harm need not be inevitable, it must be sufficiently probable to prompt a reasonable person to believe that the harm will occur more likely than not.

*In re Maya R.*, No. E2017-01634-COA-R3-PT, 2018 WL 1629930, at *8 (Tenn. Ct. App. Apr. 4, 2018) (quoting *Ray v. Ray*, 83 S.W.3d 726, 732 (Tenn. Ct. App. 2001) (footnotes omitted in *Maya R.*)).

In the instant action, the trial court found regarding this statutory ground as to Mother in pertinent part:

Throughout this case, [Mother] has remained incarcerated in the Tennessee Prison for Women. . . . As of the date of the hearing, July 2, 2020, [Mother] is still incarcerated and has not been approved for parole and does not know when she may be released. [Mother] is expected to have a parole hearing later in July 2020. If [Mother] were approved for parole her plan is to attend a half-way house, although she does not know which program; it is unlikely that [the Child] would be able to reside with her in that environment. [Mother] does not have a transportation plan upon her

- 9 -

release. [Mother] reports that she has been sober since entering prison and living in that controlled environment, however, when [Mother] was not incarcerated she was actively engaged in drug use and has not demonstrated sobriety while out in the community.

The trial court further stated:

[T]he Court finds that there is clear and convincing evidence that [Mother has] failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in [Mother's] legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child.

Upon careful review, we agree with the trial court.

Regarding the first prong of Tennessee Code Annotated § 36-1-113(g)(14), the trial court herein found that DCS had proven by clear and convincing evidence that Mother had not manifested an ability and willingness to personally assume legal and physical custody of the Child or financial responsibility for the Child. The trial court specifically found that at the time of the termination petition's filing, Mother remained incarcerated and that her release date was unknown.

Moreover, Mother had no clear plan for transportation or housing upon her release. According to Ms. Lawson, Mother also had not developed a plan for taking care of the Child when she was released. Ms. Lawson related that Mother had recently discussed entering a halfway house following her release and had informed Ms. Lawson that she wanted to reside in a halfway house that was close to where the Child was living. However, Ms. Lawson was unaware of the halfway house program's duration. In short, Mother was unable to demonstrate the ability and willingness to establish a stable home, steady income, or appropriate reintegration into the Child's life because she had remained incarcerated during the entire period the Child was in DCS's custody. DCS met its burden regarding this prong.

The second prong of this statutory ground requires DCS to prove by clear and convincing evidence that placing the Child in Mother's legal and physical custody would pose a risk of substantial harm to the Child's physical and psychological welfare. The evidence demonstrated that since December 2018 when he entered DCS custody, the Child had been residing in the same two-parent foster home along with the foster parents' two biological children. Ms. Lawson related that the foster home was appropriate and that the Child enjoyed pets, toys, and ample room to play inside and outside. According to Ms. Lawson, the Child was thriving in the foster placement. She stated that he referred to the foster parents as "mom" and "dad" and that he was very bonded to his foster

family. She also stated that the Child was smart, caring, and loved his foster parents and siblings. Ms. Lawson opined that the Child seemed unable to remember ever living in any other home.

When asked to describe the Child's interactions with the foster family, Ms. Lawson stated:

> [I]t's just loving. He looks to them for comfort or help. He's just—he fits, if that makes sense, by just the way he acts. He's just happy. And like I said, it's just loving and it's just a good environment for him.

Ms. Lawson opined that the Child considered his foster family to be his family. She also stated that all of his needs were being met in the foster home and that she had no concerns for his safety there. Ms. Lawson further testified that the foster family intended to adopt the Child and that they were open to having Mother remain involved in the Child's life to some degree.

Foster Mother related that the Child had been anxious when he first came to their home such that she was unable to leave the room without the Child becoming upset. However, by the time of trial, the Child had adjusted well and was no longer experiencing anxiety. Foster Mother opined that the Child's anxiety would likely return if he were removed from their home and separated from their family. She and Ms. Lawson each testified that the Child seemed to remember no other home or family beyond his foster home and family. They also related that the Child was not bonded to Mother, referring to Mother by her first name during visits and never inquiring about her outside of those visits.

Based on the foregoing, we conclude that the evidence does not preponderate against the trial court's finding that placing the Child into Mother's custody would pose a risk of substantial harm to the Child's physical and psychological welfare. Accordingly, inasmuch as both prongs of Tennessee Code Annotated § 36-1-113(g)(14) have been satisfied by clear and convincing evidence, we affirm the trial court's determination regarding this statutory ground for termination of Mother's parental rights.

## V. Best Interest of the Child

Mother argues that termination of her parental rights was not in the Child's best interest. When a parent has been found to be unfit by establishment of at least one statutory ground for termination of parental rights, as here, the interests of parent and child diverge, and the focus shifts to what is in the child's best interest. *In re Audrey S.*, 182 S.W.3d at 877; *see also In re Carrington H.*, 483 S.W.3d at 523 ("The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." (quoting *In re Angela E.*, 303 S.W.3d

- 11 -

240, (Tenn. 2010))). Tennessee Code Annotated § 36-1-113(i) (Supp. 2020) provides a list of factors the trial court is to consider when determining if termination of parental rights is in a child's best interest. This list is not exhaustive, and the statute does not require the court to find the existence of every factor before concluding that termination is in a child's best interest. *See In re Carrington H.*, 483 S.W.3d at 523; *In re Audrey S.*, 182 S.W.3d at 878 ("The relevancy and weight to be given each factor depends on the unique facts of each case."). Furthermore, the best interest of a child must be determined from the child's perspective and not the parent's. *White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004).

Tennessee Code Annotated § 36-1-113(i) lists the following factors for consideration:

(1)     Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2)     Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3)     Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4)     Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5)     The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6)     Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7)     Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8)     Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9)     Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

As our Supreme Court has explained regarding the best interest analysis:

"The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." In re Angela E., 303 S.W.3d [240,] 254 [(Tenn. 2010)].

When conducting the best interests analysis, courts must consider nine statutory factors listed in Tennessee Code Annotated section 36-1-113(i). These statutory factors are illustrative, not exclusive, and any party to the termination proceeding is free to offer proof of any other factor relevant to the best interests analysis. In re Carrington H., 483 S.W.3d at 523 (citing In re Audrey S., 182 S.W.3d 838, 878 (Tenn. Ct. App. 2005)). Facts considered in the best interests analysis must be proven by "a preponderance of the evidence, not by clear and convincing evidence." In re Kaliyah S., 455 S.W.3d [533,] 555 [(Tenn. 2015)] (citing In re Audrey S., 182 S.W.3d at 861). "After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest[s]." Id. When considering these statutory factors, courts must remember that "[t]he child's best interests [are] viewed from the child's, rather than the parent's, perspective." In re Audrey S., 182 S.W.3d at 878. Indeed, "[a] focus on the perspective of the child is the common theme" evident in all of the statutory factors. Id. "[W]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child. . . ." Tenn. Code Ann. § 36-1-101(d) (2017).

Ascertaining a child's best interests involves more than a "rote examination" of the statutory factors. In re Audrey S., 182 S.W.3d at 878. And the best interests analysis consists of more than tallying the number of statutory factors weighing in favor of or against termination. White v. Moody, 171 S.W.3d 187, 193-94 (Tenn. Ct. App. 2004). Rather, the facts and circumstances of each unique case dictate how weighty and relevant

- 13 -

each statutory factor is in the context of the case. <u>See In re Audrey S.</u>, 182 S.W.3d at 878. Simply put, the best interests analysis is and must remain a factually intensive undertaking, so as to ensure that every parent receives individualized consideration before fundamental parental rights are terminated. <u>In re Carrington H.</u>, 483 S.W.3d at 523. "[D]epending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." <u>In re Audrey S.</u>, 182 S.W.3d at 878 (citing <u>White v. Moody</u>, 171 S.W.3d at 194). But this does not mean that a court is relieved of the obligation of considering all the factors and all the proof. Even if the circumstances of a particular case ultimately result in the court ascribing more weight—even outcome determinative weight—to a particular statutory factor, the court must consider all of the statutory factors, as well as any other relevant proof any party offers.

*In re Gabriella D.*, 531 S.W.3d 662, 681-82 (Tenn. 2017).

In the instant action, the trial court concluded that the statutory factors weighed against maintaining Mother's parental rights to the Child. In its final order, the trial court specifically found regarding these factors relevant to Mother:

> Respondents have not made changes in their conduct or circumstances that would make it safe for [the Child] to go home. Respondents are both incarcerated and neither knows when they may be released. Respondents have engaged in drug use and criminal activity when given the opportunity to remain out in the community and have failed to provide appropriate care and supervision for [the Child].

> * * *

> There is no meaningful relationship between [the Child] and Respondents. [The Child] has been in the care of a third party and his foster parents for the majority of his life. [The Child] does not appear to have memory of his biological parents and although he appears to enjoy visitation with [Mother], he does not appear to have a parent/child relationship with her.

> Changing caregivers at this stage of his life will have a detrimental effect on him. Respondents have been in and out of incarceration for a large part of this child's life. [The Child] was in the care of a third party prior to entering foster care and does not appear to have memory of his biological parents. When [the Child] first entered foster care he exhibited

signs of anxiety and a change in caretaker is likely to cause recurrence of those symptoms.

There is crime and substance abuse in Respondents' homes.

Respondents abuse drugs, rendering them consistently unable to care for [the Child] in a safe and stable manner.

[The Child] has established a strong bond with his foster parents, who wish to adopt him.

(Paragraph numbering omitted.)

We agree that the evidence presented in light of the applicable statutory factors militates in favor of terminating Mother's parental rights to the Child. By the time of trial, Mother remained incarcerated for a crime she had committed while pregnant and for violating her parole at a time when the Child was an infant and living with an unrelated third party. Ms. Lawson acknowledged that during Mother's incarceration, Mother had completed a parenting class, cognitive behavior therapy, some financial and employment classes, and attended a peer group concerning her substance abuse issues. Mother had also maintained sobriety and work duties while in prison. However, Mother had been unable to demonstrate her sobriety outside of prison as of the date of trial and had no plan for housing or transportation upon release. In short, Mother had not demonstrated an adjustment of circumstances that would render her potential home safe for the Child.

The evidence also demonstrated that the Child did not have a meaningful relationship with Mother. Ms. Lawson testified that the Child had been taken to the prison to visit Mother on three occasions in December 2019, January 2020, and February 2020. Ms. Lawson reported that the Child called Mother by her first name and had never asked Ms. Lawson about Mother. Ms. Lawson further stated that Mother had consistently sent cards and letters to the Child during her incarceration but that no phone or video calls had taken place.

According to testimony, although the Child appeared to enjoy his visits with Mother, he did not necessarily understand that she was his biological mother. Rather, the Child referred to Foster Mother as his mother and seemed to hold no memory of his biological parents. Foster Mother also related that the Child referred to Mother by her first name and once became confused when he met another woman with the same name, mistaking her for Mother. According to both Foster Mother and Ms. Lawson, the Child never talked about Mother and was completely bonded with his foster family.

Because of the bond that had developed between the Child and his foster family, a change in caretakers or physical environment would likely be detrimental to the Child's

emotional well-being.  The Child had resided with his foster family since he was two years old and remembered no other home or family.  The Child had not only bonded with his foster parents but also with his foster siblings, and Ms. Lawson testified that the Child loved his foster family and similarly that they loved him.  She also related that his foster family wished to adopt him when possible.

The evidence further demonstrated that Mother had shown neglect of the Child while he was in her care.  Mother was convicted of a crime within weeks of giving birth to the Child.  Following her release on parole, she left the Child in the care of an unrelated third party while she engaged in drug use and violated her parole conditions.  Consequently, Mother was reincarcerated, leaving the Child with that same third party.  As such, Mother's home environment before incarceration involved drug abuse and criminal activity, rendering her unable to care for the Child in a safe and stable manner.

Based upon our thorough review of the evidence, we conclude that the proof in light of the pertinent statutory factors clearly and convincingly demonstrated that termination of Mother's parental rights was in the Child's best interest.  We therefore affirm the trial court's judgment in its entirety.

## VI.  Conclusion

For the foregoing reasons, we affirm the trial court's judgment terminating Mother's parental rights to the Child.  Costs on appeal are taxed to Casey M.  This matter is remanded to the trial court for enforcement of the judgment and collection of costs assessed below.

_____
THOMAS R. FRIERSON, II, JUDGE